UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| WYATT W. RASMUSSEN,<br><br>Plaintiff,<br><br>vs.<br><br>DUSTIN BAXTER, IN HIS OFFICIAL CAPACITY; AND BRANDON FLEAGLE, IN HIS OFFICIAL CAPACITY;<br><br>Defendants. | 3:21-CV-03021-RAL<br><br>OPINION AND ORDER GRANTING SUMMARY JUDGMENT |

This case arises out of a traffic stop that occurred on April 17, 2021, in Fort Pierre, Stanley County, South Dakota, and culminated in the arrest of Plaintiff Wyatt W. Rasmussen (Rasmussen). Rasmussen filed a pro se lawsuit under 42 U.S.C. § 1983 against the Stanley County Sheriff's Office, Deputy Dustin Baxter, Deputy Brandon Fleagle, and South Dakota Division of Criminal Investigation Agent Guy DiBenedetto. Doc. 1. This Court screened Rasmussen's complaint under § 1915A, Doc. 7, dismissing all claims except for three: (1) a claim for injunctive relief against Deputy Baxter in his official capacity for use of excessive force, (2) a claim for injunctive relief against Deputy Fleagle in his official capacity for failure to intervene, and (3) a claim for injunctive relief against Deputy Fleagle in his official capacity alleging a Fourteenth Amendment class-of-one equal protection violation, Doc. 7. After discovery, Defendants Baxter and Fleagle filed a motion for summary judgment and brief in support thereof arguing that no constitutional violations

1

occurred, Docs. 56, 57, which Rasmussen opposes, Docs. 64, 65. For the reasons discussed below, this Court grants summary judgment in favor of Defendants.

## I.      Standard on Motion for Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); McManemy v. Tierney, 970 F.3d 1034, 1037 (8th Cir. 2020). Rule 56(a) places the burden on the moving party to establish the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The nonmoving party must establish that a material fact is genuinely disputed by either "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1)(A), (B); see also Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145–46 (8th Cir. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials" in his pleading but "must set forth specific facts showing that there is a genuine issue for trial." Gacek, 666 F.3d at 1145–46 (citing Anderson, 477 U.S. at 256); see also Mosley v. City of Northwoods, 415 F.3d 908, 910 (8th Cir. 2005) (stating that a nonmovant may not merely rely on allegations or denials).

In ruling on a motion for summary judgment, the facts and inferences fairly drawn from those facts are "viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)); Taylor v. Riojas, 141 S. Ct. 52, 53 n.1 (2020) (per curiam); Intel Corp. Inv. Pol'y Comm. v. Sulyma, 140 S. Ct. 768, 779 (2020).

However, if the record contradicts the non-moving party's account so that no reasonable jury could believe it, then such an assumption in favor of their version of facts is not made. Scott v. Harris, 550 U.S. 372, 380 (2007); Intel Corp. Inv. Pol'y Comm., 140 S. Ct. at 779; McManemy, 970 F.3d at 1037; Westwater v. Church, 60 F.4th 1124, 1129 (8th Cir. 2023).

## II.   Facts

This Court takes the facts primarily from those portions of the Defendant's Statement of Undisputed Material Facts not disputed by Rasmussen, as well as dash- and body-camera footage that wholly captured the relevant events.[1] Also, this Court considers a fact undisputed where a party objects but does not cite to the record to support its objection and the fact is otherwise established in the record. Danielson v. Huether, No. 4:18-CV-04039-RAL, 2021 WL 217706, at *7 (D.S.D. Jan. 21, 2021), aff'd, No. 21-1556, 2022 WL 259455 (8th Cir. Jan. 28, 2022). "Local Rule 56.1(B) requires a party opposing a motion for summary judgment to 'respond to each numbered paragraph in the moving party's statement of material facts with a separately numbered response and appropriate citations to the record.'" Id. (citation omitted); see also Fed. R. Civ. P. 56(e)(2) (allowing courts to consider a fact undisputed when a party "fails to properly address another party's assertion of fact as required by Rule 56(c)"). "A failure to cite to the record when disputing a fact may result in the fact being deemed admitted." Danielson, 2021 WL 217706, at *7 (citing Flora v. Custer Reg'l Med. Clinic, No. CIV. 06-05031AWB, 2008 WL 4724316, at *3 (D.S.D. Oct. 24, 2008)). Additionally, when the non-moving party's objection does not undermine the accuracy of the initial statement, this Court considers such fact undisputed. See Danielson, 2021 WL 217706, at *7.

---

[1] The dash- and body-camera videos became part of the record in connection with an earlier motion hearing on a discovery issue.

On April 17, 2021, sometime around 9:30 p.m., Rasmussen pulled into Fort Pierre's Casey's General Store (Casey's) to fill up his red Ford pickup with gasoline. Doc. 58 ¶ 2; Doc. 60-1 at 2. He attempted to pay for the gas by check—a method of payment Casey's no longer accepts—and had no alternative form of payment. Doc. 59 ¶ 2; Doc. 64 ¶ 2. Anticipating that Rasmussen would drive off without paying or that a dispute would ensue, the staff at Casey's preemptively called law enforcement. Doc. 59 ¶ 2; Doc. 64 ¶ 2. Stanley County Sherriff's Deputy Dustin Baxter responded, but by the time he arrived, another customer had paid Rasmussen's bill. Doc. 64 ¶ 3.

Through this call of service, Deputy Baxter learned that Rasmussen's driver's license had been revoked. Doc. 58 ¶ 4; Doc. 64 ¶ 2. When Deputy Baxter witnessed Rasmussen enter his pickup and drive off, he decided to execute a traffic stop for driving with a revoked license. Doc. 58 ¶¶ 5, 6; Doc. 64 ¶¶ 5, 6. Deputy Baxter followed Rasmussen out of the Casey's parking lot, activating his emergency lights as they turned south on Yellowstone Street. Doc. 59 ¶ 2; Doc. 64 ¶ 2. Rasmussen did not want to pull over and risk having his vehicle towed. Doc. 64 ¶ 10. Rather than stopping, he took Deputy Baxter on a low-speed chase through the city streets of Fort Pierre. Doc. 58 ¶ 7; Vid. Ex. 00:05.

Rasmussen continued down Yellowstone Street until he came to the intersection of Yellowstone Street and East 9th Avenue, where he turned right. Doc. 58 ¶ 7; Vid. Ex. 00:40. He drove down East 9th Avenue before taking a left onto Missouri Street. Doc. 58 ¶ 7; Vid. Ex. 00:54. At this point, Deputy Baxter radioed that Rasmussen was not stopping and that they were "south bound on Missouri Street." Vid. Ex. 00:54–01:12. Stanley County Sherriff's Deputy Brandon Fleagle was nearby when the call came over the radio and drove to Missouri Street., where he joined Deputy Baxter in pursuit. Doc. 60-1 at 6. Rasmussen continued to flee, taking several more

turns before pulling into his home's driveway. Doc, 60-1 at 2; Vid. Ex.01:12–2:48. Deputy Baxter stopped his patrol cruiser at the foot of Rasmussen's driveway, facing the rear of his pickup. Doc. 64 ¶ 8; Vid. Ex. 02:48. Deputy Fleagle parked on the right side of Deputy Baxter's patrol car, also facing Rasmussen's driveway. Doc. 64 ¶ 8.

After parking his truck, Rasmussen exited his vehicle and began walking towards Deputy Baxter, who instructed Rasmussen to turn around. Vid. Ex. 02:54. Rasmussen ignored Deputy Baxter's request and continued to walk towards the Deputy, who again instructed Rasmussen to turn around. Id. at 02:54–03:02. Just as Deputy Baxter began reciting his request a third time, Rasmussen turned around to face the rear of his pickup, id. at 03:02, but as he did so, he slid his hands toward his pockets, id. at 03:03. Rather than placing his hands on his head as Deputy Baxter had instructed, Rasmussen slid his hands into his pockets. Id. Almost immediately after turning to face the back of his pickup, Rasmussen turned back around to face Deputy Baxter, his hands still in his pockets. Id. at 03:04.

As Rasmussen turned around, Deputy Baxter commanded that he place his hands on top of his head, and Rasmussen once again failed to comply. Id. at 03:06. Deputy Baxter repeated his request three more times before Rasmussen removed his hands from his pockets, yet he continued to ignore Deputy Baxter's request to place his hands on his head. Id. at 03:06–03:12.

Once Rasmussen took his hands out of his pockets, Deputy Baxter renewed his instruction for Rasmussen to turn around, but Rasmussen refused. Id. at 03:12–03:22. During that time, the video shows Rasmussen's defiance alternated between a blank stare and arguing with Deputy Baxter. Id. at 03:12–03:18. While arguing, Rasmussen again put his hands into his pockets. Id. at 03:22. Deputy Baxter then renewed his request for Rasmussen to take his hands out of his pockets and to turn around; his request was once again ignored. Id. at 03:22. The video then

shows Rasmussen shifting his gaze from Deputy Baxter to Deputy Fleagle. Id. at 03:23. With his eyes now locked onto Deputy Fleagle, Rasmussen took two and a half steps in the Deputy's direction, a path that would have placed a patrol car between himself and where Deputy Baxter stood. Id. at 03:23–03:27. In response to Rasmussen's advance toward Deputy Fleagle, Deputy Baxter deployed his taser. Id. at 03:27; Doc. 58 ¶ 12.

The taser's two prongs struck Rasmussen in his abdomen and upper thigh and initiated a five-second electric shock. Doc. 58 ¶ 12; Doc. 64 ¶ 12. The electric shock interfered with Rasmussen's neuromuscular communication, see Doc. 60-2 at 1, causing him to fall to the ground, Vid. Ex. 03:28. Once the five-second shock had ended, Deputy Baxter demanded that Rasmussen roll onto his stomach or face another round of the taser. Doc. 60-1 at 3. Rasmussen finally complied. Id. Deputy Baxter then secured Rasmussen in hand cuffs and conducted a search of Rasmussen's person, finding neither weapons nor contraband. Id.

## III.    Discussion

### A. Section 1983 Claims

Section 1983 provides a cause of action against any "person" who, acting "under color of" state law, deprives the plaintiff of "rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. Governmental entities like counties, municipalities, and their employees are suable "persons" under § 1983, and the employees can be sued in both their official and individual capacities. Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 691 (1978); Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999). When a plaintiff, as was the case here, does not specifically name the defendant in his or her individual capacity, the court presumes that the defendant was sued only in his or her official capacity. Veatch v. Bartels Lutheran Home, 627 F.3d 1254, 1257 (8th Cir. 2010). Here, Plaintiff sued two officers in their official capacities:

Deputy Baxter and Deputy Fleagle. A suit against a municipal employee, or here county employee, in his or her official capacity is treated as a suit against the municipality, or here county, for which the employee works. Kentucky v. Graham, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the [local governmental] entity."); see Bd. of Cnty. Comm'rs of Bryan Cnty., v. Brown, 520 U.S. 397, 403 (1997) (recognizing that Monell applies to municipalities and other local governmental entities like counties); Hess v. Ables, 714 F.3d 1048, 1054 (8th Cir. 2013).

But "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." Bd. of Cnty. Comm'rs of Bryan Cnty., 520 U.S. at 403 (emphasizing that § 1983's language does not impose vicarious liability based solely on an employer-employee relationship). A municipality or county will only be held liable under § 1983 if the plaintiff can show that a governmental "policy" or "custom" caused the plaintiff's injury. Id. (citing Monell, 436 U.S. at 694); City of Springfield v. Kibbe, 480 U.S. 257, 267 (1987) ("It is only when the execution of the government's policy or custom . . . inflicts the injury that the municipality may be held liable under § 1983."). This rule ensures that a municipality or county will be liable only for those constitutional deprivations resulting from its own acts rather than acts of its employees. Id.

"Policy" and "custom" mean different things under Monell. Corwin v. City of Independence, 829 F.3d 695, 699–700 (8th Cir. 2016). An official policy includes actions by its legislative body, Connick v. Thompson, 563 U.S. 51, 61 (2011), and decisions or actions by an employee who has "final policymaking authority" as to "the subject matter in question," Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986) (plurality opinion). To prove a custom, on the other hand, a plaintiff must show:

> the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to

7

> or tacit authorization of such conduct by the governmental entity's policymaking
> officials after notice to the officials of that misconduct; and (3) that plaintiff was
> injured by acts pursuant to the governmental entity's custom, i.e., that the custom
> was a moving force behind the constitutional violation.

Corwin, 829 F.3d at 700 (citation omitted).

Furthermore, a governmental entity is not liable under § 1983 unless there is "a direct causal link between" the entity's policy or custom and the plaintiff's constitutional deprivation. City of Canton v. Harris, 489 U.S. 378, 385 (1989); see also Bd. of Cnty. Comm'rs of Bryan Cnty., 520 U.S. at 404 (explaining that the plaintiff must show that the county, "through its *deliberate* conduct, . . . was the 'moving force' behind the injury alleged"). Therefore, to survive summary judgment for a § 1983 claim made against a county or municipality, a plaintiff must show some evidence that the claimed constitutional violation directly resulted from a municipal policy or custom. Szabla v. City of Brooklyn Park, 486 F.3d 385, 392–93 (8th Cir. 2007) (en banc).

Here, Rasmussen has not presented any evidence to suggest that Stanley County's Sheriff's Office "created, adopted, or supported any policy or custom that would demonstrate [county] liability." See Jackson v. Stair, 944 F.3d 704, 709 (8th Cir. 2019). Initially, Rasmussen did not even claim that the Stanley County Sheriff's Office's use-of-force policy was unconstitutional or the cause of his injury. See Doc. 1. Instead, his complaint states that the defendants "failed to comply with its own use of force policy[.]" Id. at 4. Only in Defendants' statement of undisputed facts did Rasmussen assert for the first time that the "Stanley County Sheriff's Office's electronic control device (ECD) policy is not facially constitutional."[2] Doc. 64

---

[2] Under the Federal Rules of Civil Procedure Rule 8(a), "pleadings must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" N. States Power Co. v. Fed. Transit Admin., 358 F.3d 1050, 1056 (8th Cir. 2004) (citation omitted). While the pleadings requirements under Rule 8(a) are quite permissive, a party is not entitled "to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment." Wendt v. Iowa, 971 F.3d 816, 821 (8th Cir. 2020) (citation omitted). The purpose of the pleading

at 9. Even then, he failed to produce evidence or cite any authority to support his position. <u>See</u>

<u>id.</u>

Stanley County's ECD policy is not facially, or otherwise, unconstitutional. "A municipal

policy or practice is unconstitutional 'on its face' where the policy or practice 'itself violates

federal law or directs an employee to do so.'" <u>Brossart v. Janke</u>, 859 F.3d 616, 627 (8th Cir. 2017)

(quoting <u>Szabla</u>, 486 F.3d at 389). Here, Stanley County's ECD policy does not instruct or direct

a Stanley County Deputy to violate the Fourth Amendment. The written policy permits officers

to use a taser in the following circumstances:

(1) A person may be criminally charged and demonstrates an overt intention to use violence or force against an officer or others;
(2) A person resists detention and arrest, and other alternatives for controlling them are not reasonable or available under the circumstances;
(3) Officers may use ECD's to protect a person who poses a danger to themselves or others. ECD's may only be used to the level of force that reasonably appears necessary to control or subdue a violent or potentially violent person;
(4) ECD's should be deployed no more than what is reasonably necessary to accomplish subduing a person until alternate means can be sued to ensure compliance. A higher level of justification is required for deploying the ECD more than three times on a single individual. This Justification must be present and articulated on the Use of Force report.

---

requirements is to "give the defendant fair notice of what the claim is *and the grounds upon which it rests.*" <u>WireCo WorldGroup, Inc. v. Liberty Mut. Fire Ins. Co.</u>, 897 F.3d 987, 993 (8th Cir. 2018) (emphasis added). Because a suit against an officer is treated as a suit against the municipality for which the employee works, <u>Kentucky</u>, 473 U.S. at 166, with how this Court interpreted Rasmussen's complaint, Doc. 7, the defendants had fair notice of the general claim; however, Rasmussen's complaint did not fairly provide notice of the grounds upon which his claim rested. He first stated that the deputies failed to adhere to the County's taser policy, which implies that the policy suffered no legal deficiencies. Only after Defendants filed their motion for summary judgement did Rasmussen realize the inadequacy of his original claim and attempt to alter the grounds on which his claim rests. Historically, in such circumstances, this Court has refused to consider a claim not fairly raised in the complaint. <u>See generally</u> <u>East v. Dooley</u>, No. 4:19-cv-04126-RAL, 2020 WL 5816248, at *27 (D.S.D. Sept. 30, 2020), <u>aff'd</u>, 847 F. App'x 359 (8th Cir. 2021).

Doc. 60-2 at 1–3. The Eighth Circuit has previously held taser policies containing similar language to be facially constitutional. See Hollingsworth v. City of St. Ann, 800 F.3d 985, 992 (8th Cir. 2015) (holding that a taser policy is not unlawful nor does it compel unconstitutional action when the policy allows for discretion and permits a taser to be used on a detainee that "presented a non-immediate, but 'foreseeable' threat," and the policy did not allow the taser to be used for "punishment" or "coercion"); see also Brossart, 859 F.3d at 623, 627 (holding that a taser policy is constitutional when it authorizes a taser to be used when officers are "faced with actual or threatened physical resistance" and a suspect is passively resisting and the resistance is accompanied by a risk of possible injury to the suspect or an officer).

Although this Court finds Stanley County's ECD policy to be facially constitutional, even if it had not, Rasmussen has failed to present any evidence showing "a direct causal link between" the county's policy or custom and his alleged constitutional deprivation. See City of Canton, 489 U.S. at 385. As discussed below, Deputy Baxter's and Deputy Fleagle's conduct does not constitute excessive force. Without evidence of an actual constitutional deprivation, Rasmussen's § 1983 claims must fail. Therefore, Rasmussen's claim against Stanley County, through the deputies in their official capacities, cannot survive the motion for summary judgment.

**B. Excessive Use of Force**

The Fourth Amendment includes the right "to be secure . . . against unreasonable . . . seizures," U.S. Const. amend. IV. When a citizen claims that an officer used excessive force during an arrest or other seizure of their person, that claim is analyzed under the Fourth Amendment's objective reasonableness standard. Graham v. Connor, 490 U.S. 386, 388 (1989). "We evaluate the reasonableness of the force used from the perspective of a reasonable officer on the scene," Kohorst v. Smith, 968 F.3d 871, 876 (8th Cir. 2020), without "the 20/20 vision of

hindsight," Cnty. of Los Angeles v. Mendez, 581 U.S. 420, 428 (2017) (citation omitted).  This reasonableness standard respects that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary to a particular situation." Graham, 490 U.S. at 397.  The reasonableness inquiry requires careful consideration of the particular facts and circumstances of each case, including: "(1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." Kohorst, 968 F.3d at 876 (quoting Michael v. Tevaena, 899 F.3d 528, 532 (8th Cir. 2018)).  Courts may also supplement this analysis by considering the degree of injury the plaintiff sustains from the alleged use of force.  See id. (citing Crumley v. City of Saint Paul, 324 F.3d 1003, 1007 (8th Cir. 2003)); Chambers v. Pennycook, 641 F.3d 898, 906 (8th Cir. 2011).

"The use of force is least justified against a nonviolent misdemeanant who does not flee or actively resist and poses little threat to the officers or the public." Kohorst, 968 F.3d at 876 (quoting Jackson, 944 F.3d at 711).  In such cases the use of more than de minimis force is objectively unreasonable. See generally Kelsay v. Ernst, 933 F.3d 975, 985 (8th Cir. 2019) (Smith, C.J., dissenting) (discussing where use of force by police is unreasonable).  That said, when a person being arrested uses passive resistance, including refusal to follow law-enforcement instruction, "more force may reasonably be required." Kohorst, 968 F.3d at 876.

The United States Court of Appeals for the Eighth Circuit has "upheld the use of force where a suspect is non-compliant and resists arrest or ignores commands from law enforcement." Kohorst, 968 F.3d at 876; see Jackson v. Stair, 944 F.3d 704, 711 (8th Cir. 2019).  In Jackson, a case with similar facts to Rasmussen's claims, police were dispatched to a local tire repair shop

where an altercation had arisen between a customer and the shop's mechanics. 944 F.3d at 708. The customer believed that the mechanics had damaged a lug nut while conducting tire repairs. Id. The police officer approached the incensed customer and instructed him to stand by the patrol car and to keep his hands out of his pockets. Id. The customer, instead of complying, put a hand into his pocket, walked in front of the officer, and began shouting at him. Id. The officer ordered the customer to turn around, but the customer ignored the command and grew more incensed. Id. The officer, after pulling out his taser, again ordered the customer to turn around, but this too only prompted more yelling from the customer. Id. The officer repeated his request five more times. Id. At which point, the customer put his hands up but remained facing the officer. Id. After an additional order, the customer turned around with his hands in the air. Id. Another officer approached the customer to handcuff him. Id. As the officer approached, the customer wheeled around to face the second officer with a fist raised towards the officer's head. Id. The first officer deployed his taser, dropping the customer to the floor. Id. Mere moments later, the officer deployed the taser a second time. Id. The officer then ordered the customer to flip onto his stomach. Id. The officer repeated his request, but the customer tried to get to his knees instead. Id. This prompted the officer to deploy the taser a third time. Id.

In determining whether the officer's use of the taser constituted excessive use of force, the Eighth Circuit held that the first and third instances were objectively reasonably. Id. at 711, 713. The court determined that the first taser was reasonable because the customer was non-compliant, aggressive, and ignored multiple orders from law enforcement that would have made the encounter safer for the officers. Id. at 711. The court stated that, under the circumstances, a reasonable officer could have viewed the customer's conduct as "threatening, resisting arrest, and endangering the safety of an officer." Id. As for the third taser deployment, the court stated that "a reasonable

officer could have perceived the customer to be resisting arrest and could have feared for their safety." Id. at 713 (cleaned up); Ehlers v. City of Rapid City, 846 F.3d 1002, 1011 (8th Cir. 2017) (stating that law enforcement officers are entitled to use what force is necessary to effect an arrest when the arrestee "at least appear[s] to be resisting").

Here, Rasmussen similarly ignored police orders, acted aggressively, and made a threatening advancement toward law enforcement. Vid. Ex. 03:23. Like law enforcement in Jackson, Deputy Baxter had to order Rasmussen to turn around and take his hands out of his pockets several times—here, at least nine times. Id. 02:54–03:27. Rasmussen's aggression towards the deputies was also similar to the customer's actions in Jackson. Rasmussen continually argued with Deputy Baxter and intermittently did the exact opposite of what Deputy Baxter had ordered. Id. 03:04–03:12; Doc. 58 ¶¶ 9–12. Rasmussen's argumentative conduct followed numerous pre-attack indicators, such as refusal to stop for law enforcement, diverting and refocusing attention on Deputy Fleagle, and a "thousand-yard stare." Doc. 60-1 at 4; Vid. Ex. 03:12–03:27. And although Rasmussen was not close enough to swing at either of the deputies, Rasmussen was walking towards Deputy Fleagle when tased. Vid. Ex. 03:27; Doc. 60-1 at 2–3. Under these circumstances, a reasonable officer in Deputy Baxter's shoes could view Rasmussen's conduct as resisting arrest and endangering the safety of law enforcement. See Kohorst, 968 F.3d at 878 (quoting Craver v. Shuster, 885 F.3d 1135, 1140 (8th Cir. 2018)) (Even "unarmed, passively resisting subjects can pose a threat necessitating the use of a taser.").

This Court disagrees with Rasmussen's assertion that no force was appropriate because he was arrested for non-violent misdemeanors and was not physically resisting arrest. As the Eighth Circuit stated in Ehlers, "an arrestee's subjective motive[s] do not bear on how a reasonable officer would have interpreted his behavior." 846 F.3d at 1011. Officers are "entitled to use the force

necessary to effect an arrest where a suspect '*at least appears to be resisting*.'" <u>Kohorst</u>, 968 F.3d at 876 (quoting <u>Ehlers</u>, 846 F.3d at 1011). To a reasonable officer, Rasmussen "at least appeared to be resisting," so the use of force was objectively reasonable. <u>Id.</u> at 1011.

The Eighth Circuit case of <u>Ehlers</u> parallels the facts of Rasmussen's case and illustrates why Rasmussen's argument fails. In <u>Ehlers</u>, the plaintiff's wife and adult children were kicked out of a hockey game for an altercation with another fan and arena security personnel. <u>Id.</u> at 1007. By the time the plaintiff was advised of the dispute, police had arrived and had begun arresting members of his family. <u>Id.</u> The plaintiff approached the arresting officer, who instructed him to "step back to the curb." <u>Id.</u> But the plaintiff disregarded the instruction and proceeded to step closer to the officer. <u>Id.</u> Again, the officer ordered the plaintiff to step back to the sidewalk. <u>Id.</u> The arresting officer then instructed a passing officer to "take this guy, he's not listening." <u>Id.</u>

At this point, the plaintiff in <u>Ehlers</u> began walking away from the officers and back towards the arena. <u>Id.</u> The assisting officer twice instructed the plaintiff to put his hands behind his back, but the plaintiff ignored the request and continued walking away. <u>Id.</u> The officer then "executed a spin takedown," grabbing the plaintiff's neck and shoulders, forcing him to the ground. <u>Id.</u> The plaintiff landed on his back, so the officer flipped him onto his hands and knees and commanded that he place his hands behind his back. <u>Id.</u> Two more officers arrived to lend assistance. <u>Id.</u> One crossed the plaintiff's legs and lifted them towards his back to push the plaintiff face down into the ground. <u>Id.</u> The second pushed the plaintiff's left arm out from under him, locking out his elbow before bringing it around to the plaintiff's back to be handcuffed. <u>Id.</u> at 1007–08.

14

Meanwhile, the first officer took his taser and dry stunned the plaintiff in the low back.[3] Id. at 1008. The plaintiff brought suit against the officers asserting that the takedown and the taser use both constituted an excessive use of force. Id. The Eighth Circuit, however, disagreed, holding that neither constituted excessive use of force. Id. at 1011. Regarding the taser, the Eighth Circuit reasoned that the "officers at the scene reasonably could have interpreted [the plaintiff's] behavior of continuing to lay on his hands and refusing to comply with instructions as resistance and reasonably responded" with the use of a taser, "regardless of whether [the plaintiff] actually intended to resist." Id. at 1011.

Although Rasmussen's charges may have been misdemeanors and he had not physically contacted police, Deputy Baxter's use of a taser remains reasonable and indeed far less aggressive than the police conduct in Ehlers. Like in Ehlers, Rasmussen's subjective motivation for his actions does not negate how a reasonable officer perceives them. Here, Rasmussen was not walking away from the officers, like the plaintiff in Ehlers was, when Deputy Baxter elevated his level of force. Instead, Rasmussen was actively advancing towards Deputy Fleagle when Deputy Baxter deployed his taser. Vid. Ex. 03:23; Doc. 58 ¶ 11; Doc. 60-1 at 3. The increased use of force came only after Rasmussen led police on a pursuit, repeatedly disobeyed orders, and demonstrated aggression towards law enforcement. Doc. 60-1 at 2–7; Vid. Ex. 02:54–03:27.

Under these circumstances, there is no genuine issue of material fact, and Deputy Baxter's taser use was not an excessive use of force. This Court grants summary judgment for Deputy Baxter on the claim of excessive force against Deputy Baxter.

### C. Failure to Intervene

---

[3] The parties disputed whether the taser's prongs were in contact with the plaintiff's body when the taser discharged; however, for the purpose of their analysis, the Eighth Circuit assumed that the taser was in contact with the plaintiff's body. Ehlers, 846 F.3d at 1008, 1011.

Failure to intervene is another cognizable theory for an excessive use of force claim that stems from a law enforcement officer's duty to prevent another officer from using excessive force. See Hollingsworth v. City of St. Ann, 800 F.3d 985, 991 (8th Cir. 2015) ("An officer who fails to intervene to prevent the unconstitutional use of excessive force by another officer may be held liable for violating the Fourth Amendment."). To establish a failure to intervene claim, the plaintiff must show "(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." Nance v. Sammis, 586 F.3d 604, 612 (8th Cir. 2009).

Rasmussen's failure to intervene claim does not meet the first element because Deputy Baxter did not subject him to excessive force.  And even if Rasmussen could prove the first element, his claim does not meet the second element which requires evidence showing that the defendant had "the opportunity and the means to prevent the harm [excessive force] from occurring." Id. (citation omitted).  Rasmussen appears to argue that Deputy Fleagle should have taken steps early in the traffic stop to deescalate the situation and negate the need for a taser altogether. See Doc. 59-1 at 1. Rasmussen asserts:

> Deputy Fleagle should have advanced, and I would have never been tased.  If they would have made an ordinary traffic stop, which was get of their car, approach me when I was at the tailgate of the car . . . he could have came up and put the hand on me when I was standing on the back of the truck and ended all of this.

While it is true that an officer's "failure to take action to deescalate [a] situation" before excessive force is used can serve as a basis for a failure to intervene claim, the officer must still have had the opportunity and means of preventing the excessive force from being used. Nance, 586 F.3d at 612; see Mitchell v. Kirchmeier, 28 F.4th 888, 901 (8th Cir. 2022).  In Mitchell, a police sergeant had directed officers to use non-lethal munitions, such as lead laden bean-bag rounds, on a group of peaceful protestors. Id. at 894.  The plaintiff, Mitchell, was one of the

peaceful protestors injured by the bean bag rounds.  Id.  Mitchell was hit three times with the lead-filled bags.  Id. One hit Mitchell in the face, shattering his left eye socket and lodging itself in his eye.  Id.  Mitchell brought various § 1983 claims for excessive use of force, including a failure to intervene claim against the sergeant who authorized and directed the use of lead-filled bean bags against peaceful protestors.  Id.

The Eighth Circuit reasoned that the police sergeant had the opportunity and means to stop the use of force before Mitchell was injured because the sergeant was the "scene commander" and had observed the use of bean bag munitions on the protestors "for some time before they shot Mitchell."  Id. at 901.  Here, however, Deputy Fleagle had no such opportunity or means of stopping Rasmussen from being tased.

First, Deputy Fleagle was assisting Deputy Baxter.  See Doc. 60–1 at 6.  It was Baxter who had initiated the stop, made first contact with Rasmussen, and was giving Rasmussen all the commands.  Id. at 2–7; Vid. Ex. 02:54.  Second, through these commands, Deputy Baxter was already attempting to deescalate the situation.  See Vid. Ex. 02:54–03:27.  If Rasmussen would have complied, the threat perceived by the deputies would have dissipated allowing Rasmussen to be arrested with nothing more than "soft-hands."  Third, and contrary to Rasmussen's contention, the approximately two seconds Rasmussen faced the back of his tailgate before turning around was not long enough for Deputy Fleagle to have safely approached and handcuffed Rasmussen. See id. 03:03–03:04.  Further, even when Rasmussen was facing the truck's tailgate, his hands were in his pockets, increasing the deputies' perception of threat of physical harm to their safety. Id. 03:02.  Fourth, Deputy Baxter's response to Rasmussen walking toward Deputy Fleagle was an instant, one-time exercise of force.  Deputy Fleagle had no time to intervene in an effective, safe, and less forceful way.  Lastly, Rasmussen himself appears to concede that though he wishes

Deputy Fleagle had intervened, he did not have an opportunity to do so. Doc. 65 at 3. ("Deputy Fleagle did not have the opportunity to intervene.").

Because there is no genuine issue of material fact as to whether Deputy Fleagle had observed or had reason to know that excessive force would be used, and he did not have the opportunity or means to intervene, the Court grants summary judgment in favor of Deputy Fleagle on Rasmussen's failure to intervene claim.

## D. Equal Protection

Rasmussen also claims that Deputy Fleagle discriminated against him "on the basis of [m]arital and [p]arental status." Deputy Fleagle is married to Rasmussen's ex-wife and is a stepfather to Rasmussen's children. Doc. 57 at 14; Doc. 1 at 4. Rasmussen alleges that this familial relationship motivated Fleagle to act towards him with personal animus. Doc. 1 at 4. This Court's § 1915 screening order liberally construed Rasmussen's complaint to assert a class-of-one equal protection violation. Doc. 7 at 7.

"The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination." Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam). Generally, a plaintiff alleging an equal protection violation claims to be a member of an identifiable group that has suffered arbitrary and invidious discrimination. Engquist v. Or. Dep't of Ag., 553 U.S. 591, 600–01 (2008). A plaintiff, however, may also assert a class-of-one equal protection challenge; such challenges assert that an individual has been "irrationally singled out" for discriminatory treatment. Id. at 601. To state a cognizable class-of-one equal protection claim, a plaintiff must allege (1) that the defendant "intentionally treated plaintiff differently than others similarly situated" and (2) "there is no rational basis for the difference in treatment." Olech, 528 U.S. at 564.

The threshold inquiry in a class-of-one equal protection claim is whether the plaintiff is similarly situated to others who have received preferential treatment. Robbins v. Becker, 794 F.3d 988, 996 (8th Cir. 2015) (cleaned up). Absent such a threshold showing, the plaintiff's equal protection claim is not viable. Id. The "plaintiff must demonstrate that the level of similarity between [himself] and the persons with whom they compare themselves [is] extremely high." Hardesty v. Sacramento Metro. Air Quality Mgmt. Dist., 935 F. Supp. 2d 968, 983 (E.D. Cal. 2013) (citation omitted) (second alteration in original); Purze v. Vill. of Winthrop Harbor, 286 F.3d 452, 455 (7th Cir. 2002). And a court should not hesitate to grant summary judgment when "a plaintiff fails to identify other similarly situated individuals." See Gohl v. Livonia Pub. Sch., 134 F. Supp. 3d 1066, 1088 (E.D. Mich. 2015).

Here, Rasmussen does not identify or compare himself with any similarly situated persons. Rather, Rasmussen's complaint does nothing more than allude to the idea that Deputy Fleagle's familial tie led Rasmussen to be treated differently than he otherwise would have been. Doc. 1 at 4. Rasmussen's failure to identify a group of similarly situated individuals treated differently than he was justifies summary judgment in favor of Deputy Fleagle on this issue.

However, even if this Court were to compare him to some similarly situated individuals, Rasmussen is most appropriately compared to those persons who flee from police, actively resist law enforcement instruction, and make threatening advancements toward officers in tense and contentious situations. See Hardesty, 935 F. Supp. 2d at 983 (requiring level of similarity to be high). As explained earlier in this decision, the use of a taser on a non-compliant, resistant motorist is an objectively reasonable use of force that Courts have repeatedly accepted.

Rasmussen also cannot show that Deputy Fleagle *intentionally treated* him differently than other similarly situated persons. To prevail on a class-of-one equal protection claim, a plaintiff

must show not only "irrational and wholly arbitrary acts, but also intentional disparate treatment."

Giordano v. City of New York, 274 F.3d 740, 751 (2d Cir. 2001) (quoting Olech, 528 U.S. at 565)

(cleaned up).  Based on the undisputed facts, Deputy Fleagle's involvement in the traffic stop was

one of secondary support; he did not take any action against Rasmussen that could be considered

*intentional treatment*.  Deputy Fleagle did not respond to the initial Casey's call for service, did

not attempt to initiate the traffic stop for the revoked license, and did not discharge his taser or

exert any manner of force upon Rasmussen.  Doc. 60-1 at 2–7.  Indeed, Rasmussen admited under

oath that Deputy Fleagle has never been an arresting or charging officer on calls when Rasmussen

is a suspect.  Doc. 59-1 at 2.

Rasmussen's entire equal protection claim rests on Deputy Fleagle's mere presence at the

scene and his relationship to Rasmussen's ex-wife and children.  On these facts, the claim must

fail.  There is no evidence that Deputy Fleagle intentionally treated Rasmussen irrationally,

arbitrarily, or differently than others.  Rather, the facts tend to show that Deputy Fleagle hardly

interacted with Rasmussen at all at the scene.

Because Rasmussen has failed to show that he was similarly situated to others and received

different treatment from those other persons, he has failed to satisfy the first element of a class-of-

one equal protection violation.  The failure to allege treatment different from a similarly situated

class is fatal to an equal protection claim.

Furthermore, a class-of-one equal protection claim fails when "there is any reasonably

conceivable state of facts that could provide a rational basis for the classification." Heller v. Doe,

509 U.S. 312, 320 (1993); see also Bd. Tr. of Univ. of Al. v. Garrett, 531 U.S. 356, 367 (2001)

("To prove that no rational basis existed, the plaintiff must negate any reasonably conceived state

of facts that could provide a rational basis for the classification.").  Even if Rasmussen were able

to prove that he was treated differently, he cannot "negate every reasonably conceivable state of facts that could provide a rational basis" for the disparate treatment. Heller, 509 U.S. at 320. As reflected in Deputy Baxter's police report, Rasmussen "has a history of resisting law enforcement" and had made past threats "to carry and use bear spray." Doc. 60-1 at 2; Doc. 65-2 at 12. Rasmussen's history, along with his decision to flee from police and his insubordinate conduct, increased the perceived threat of danger to a reasonable officer and provided Deputies Baxter and Fleagle with a rational basis for treating Rasmussen differently than others.

Rasmussen has failed to establish a genuine dispute as to any material fact, and the defendants are entitled to judgment as a matter of law. Thus, this Court grants judgment in favor of the defendant Deputy Fleagle.

## E. Injunctive Relief

Rasmussen seeks injunctive relief as well and plainly is not entitled to such relief. As the plaintiff in this case, Rasmussen bears the burden of demonstrating that he has standing under Article III of the Constitution to request injunctive relief. Park v. Forest Serv. of U.S., 205 F.3d 1034, 1037 (8th Cir. 2000). To establish standing, Rasmussen must illustrate an injury in fact, a causal connection between the injury and the defendants' alleged conduct, and a likelihood that the remedy he seeks will redress his alleged injury. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102–04 (1998). When a plaintiff seeks injunctive relief, "'the injury in fact' element of standing requires a showing that the plaintiff faces a threat of ongoing or future harm," Park, 205 F.3d at 1037, a requirement Rasmussen cannot meet.

The Supreme Court of the United States has consistently observed that "past wrongs do not in themselves amount to [the] real and immediate threat necessary to make out a [live] case or controversy" for a party seeking injunctive relief. City of Los Angeles v. Lyons, 461 U.S. 95, 103

(1983); see O'Shea v. Littleton, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."). To establish a case or controversy upon which injunctive relief may be granted, the plaintiff must show "the likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law." Lyons, 461 U.S. at 103. And a plaintiff's speculation that he may suffer injury in the future is inadequate. McClanahan v. Young, No. 4:13-CV-04140-RAL, 2016 WL 520983, at *11 (D.S.D. Feb. 5, 2016) (citing Lyons, 461 U.S. at 102). Absent a showing of any real or immediate threat that Rasmussen will be unlawfully tased in the future, injunctive relief is unavailable. Lyons, 461 U.S. at 111.

A plaintiff's "assertion that he may again be subject to illegal [force] does not create the actual controversy that must exist for [injunctive relief] to be entered." Id. at 104. In Lyons, police officers conducted a traffic stop and, without provocation or justification, allegedly seized the driver and instituted a chokehold that damaged his larynx and caused him to lose consciousness. Id. at 98. The driver sued the City of Los Angeles and the four police officers involved, seeking both monetary damages and injunctive relief against the Los Angeles Police Department's use of chokeholds. Id. Although the Supreme Court held that Lyons could maintain a suit for money damages based on a past harm, the Court held that he did not have standing to seek an injunction. Id. at 109. The Court reasoned that "any future threat to Lyons from the City's policy [on chokeholds] or from the conduct of police officers would be no more real than the possibility that he would again have an encounter with the police and that either he would illegally resist arrest or detention or the officers would disobey their instructions and again [use a chokehold] without provocation." Id. at 106.

Similar to the plaintiff in <u>Lyons</u>, Rasmussen cannot show a real and immediate threat of unlawful use of force. Any future incident that results in Rasmussen being tased rests on the presumption that Rasmussen will act in a way perceived as illegal, the apparently illegal conduct will lead to an encounter with law enforcement, and law enforcement will tase him during the encounter. Such speculation is insufficient to establish the existence of a present, live controversy. <u>Id.</u> at 105. Rasmussen also fails to demonstrate any police behavior constituting a systematic pattern of constitutional wrongdoing that would warrant an injunction. <u>See</u> <u>Allee v. Medrano</u>, 416 U.S. 802, 812 (1974) (approving injunctive relief when there is a pattern of unconstitutional police conduct); <u>but see</u> <u>Rizzo v. Goods</u>, 423 U.S. 362, 375 (1976) (distinguishing between conduct involving patterns of unconstitutional misconduct and discrete occurrences).

Lastly, granting an injunction would require Rasmussen to actually have suffered an ongoing use of excessive force or face a real and immediate threat of future uses of excessive force. Unlike in <u>Lyons</u>, where the court found the officer's use of a chokehold to be illegal, Deputy Baxter's taser deployment was not excessive under the circumstances. Rather, it fell within the spectrum of force reasonably necessary to safely execute Rasmussen's arrest. So, even if Rasmussen does face future uses of force analogous to what Deputy Baxter used, under those circumstances, he does not face any threat of future constitutional deprivations. Accordingly, Rasmussen fails to show any real or immediate threat of being unlawfully tased and therefore fails to establish the standing necessary to pursue a claim of injunctive relief. Thus, this Court grants summary judgment in favor of the defendants on Rasmussen's request for such relief.

## IV.    Other Motions

After the defendants filed their motion for summary judgment, Rasmussen filed a Motion to Compel, Doc. 61, seeking to have the defendants provide him a flash drive of the body- and

dash-camera video played during the prior hearing; a Motion to Amend Complaint without Leave, Doc. 68, notwithstanding that Rasmussen's time to amend as a matter of course elapsed long before under Fed. R. Civ. P. 15(a); Plaintiff's Motion for Preliminary Injunction, Doc. 69; Plaintiff's Motion to Release Evidence to the Public, Doc. 73, whereby he wants this Court to release to the public the body- and dash-camera video and other information that he believes inaccurately assesses what risk he poses; and Plaintiff's Motion to Schedule Trial, Doc. 75. The grant of summary judgment renders these motions moot.

## V.    Conclusion

For all the reasons previously discussed, it is

> ORDERED that the Defendants' Motion for Summary Judgment, Doc. 56, is granted as to all the plaintiff's claims for relief. It is further

> ORDERED that all of Rasmussen's remaining motions, Docs. 61, 68, 69, 73, and 75, are denied as moot.

> DATED this 11ᵗʰ day of October, 2023.

BY THE COURT:

_____
ROBERTO A. LANGE
CHIEF JUDGE